May it please the court, counsel. My name is Aaron Thompson. I'm from Pocatello, Idaho, and I represent the Evans and the other plaintiffs in this case. The Evans are present here in the courtroom today. The Nevada v. Hicks case cited this language, and I think it is important for the court to remember this, as a preface to the Montana exceptions. It stated, in straight, we explain that what is necessary to protect tribal self-government and control internal relations can be understood by looking at the examples of tribal power to which Montana referred to. Tribes have authority to punish tribal offenders, to determine tribal membership, to regulate domestic relations among members, and to prescribe rules for inheritance of members. And then in the Montana method. Can I kind of cut to the chase on this? I think it's pretty clear that the Supreme Court, in almost all these cases, would be on your side. You've got one case that's troubling. That's Brendale. Yes, Your Honor. How do you distinguish Brendale from this situation? Your Honor, the Evans situation is similar to the Wilkinson property in the Brendale ruling. And you've got to remember that there were two, in essence, decisions in that case. Well, there wasn't a morality that there was no. So it's a little certain that Justice Stevens and Justice O'Connor made the law of the land in that case. Sort of, kind of, yeah. Under that, under their concurring opinion, how do you win? Your Honor, in the Wilkinson property, Mr. Wilkinson went to apply for a zoning deviation by which there would be several acres, which they would subdivide, and there would be several, I believe, 20 single family dwellings on the Wilkinson property. On about 160, if I recall correctly, about 160 acres in this case. It was inside the whole reservation. There was no general access from the public. They wanted to have a casino. They wanted to have, basically, guard towers. They wanted to have, basically, an entirely different change of scenery, if you will. In this situation, you've got a single family residence near the airport at Pocatello. You've got a gravel pit. You've got a public highway. Help us with this, because, I mean, to me, that's really your, if there is a safety valve for you, that's it, and distinguishing why the governing rule that comes out of Brindale is distinguishable. Correct. But in Brindale, there's the Wilkinson property and, obviously, the Brindale property. And the Brindale property was found in the heart of the reservation. And that was the card shacks and the, quote unquote, closed area of the reservation. The Wilkinson property was designated. They used the language open, although the court ultimately rejected that particular terminology. But what they said is, you have to look at the surrounding parcels. You have to look at it. And in this case, in the Evans case, it is almost directly analogous to the Wilkinson scenario in that the abutting areas, many single family dwellings, and what they're asking for. And in Wilkinson, I call it Wilkinson light, because in Wilkinson, they were asking for 20 single family dwellings, dropping septic tanks and dropping wells in that scenario. And the court stated, no tribal jurisdiction over the Wilkinson property. Supreme Court. So what's, again, tell me what the rule of law that comes out of Barkindale is. Out of, excuse me. Out of the Brindale, I'm sorry, opinion. What's the rule of law? The rule of law is that you have to look at the individual properties on a case-by-case basis to determine the impact upon the subsistence of the tribe. And if that's the rule, then remember, we only oust the tribal courts of initial jurisdiction when it is clear. So are you saying that there must be a factual finding? In other words, what troubles me about this is that we want to have a clear rule for district judges to obey. And what you're saying is, well, you have to look at the facts to determine whether or not the rule applies. Is that, am I correctly saying what your position is? Your Honor, my position is that in the Brindale decision, unfortunately, there are two decisions that came out of that decision. But we have to. I think what we have to look at the concurring decision is the controlling one. And I thought you might argue that what the concurring decision tells us, if we're dealing with an open area, then it's an open area in which we're just dealing with housing that were outside the jurisdiction of the tribe. But I'm concerned that if what we have to look at is the actual impact in every case, then we don't have a clear rule. We're talking about ousting jurisdiction from the tribal courts as opposed to deciding the case. You might win the case eventually. Is there a simple rule of law that we can apply in this area? Your Honor, I think we have to go back to the Montana. I think we have to go back to the two exceptions. And I think you have to look at the cases that interpret it onto the second exception to the Montana rule, including the recent decision of Plains Commerce. And the Plains Commerce decision at the end of the ruling makes it very clear that the Montana second exception is to be limited, narrowly construed. We don't want a situation where the exception is swallowing the rule. And then the language that Justice Roberts included in his opinion, it must have a catastrophic impact and imperil the subsistence of the tribe in order for the second Montana exception to apply, thereby granting or allowing for jurisdiction in the tribal court. So your answer to Judge Hurwitz's question is, yes, Your Honor, it is fact specific. And that's the only way you can do it, because that's the way the Supreme Court did it in Plains Commerce, because that's the only way you distinguish this earlier case. There's a presumption that tribal law does not apply to fee land in this situation. The Chief Justice distinguished that case as a very narrow, factually distinct situation. And in reality, even though words are words are words, and it might make it more difficult for a district judge, the fact is that's what the Supreme Court's done. That's the language we have to follow. So what you're saying, and I appreciate this exchange here, what you're saying is that you start out with a presumption that tribal law doesn't apply here, and that the tribe then has to demonstrate that this is one of those rare circumstances that fits within the second Montana exception? Correct. OK. If this were land encircled by the reservation, exactly the same situation, let's assume a very thin strip of the reservation, went around, I take it there's an airport right next door, so it went around right by the airport, would we have a different situation? Factually, you'd have to look at that case, and I think you have to compare that to the Brendel analysis. Unfortunately, Brendel. In that case, given the split in Brendel, there would probably be tribal jurisdiction, wouldn't there? Unfortunately, Brendel would leave us with the question of whether or not it is sufficiently closed for the purposes of asserting tribal jurisdiction. If the tribe maintains the ability to zone, if the tribe has the ability to permit land use permits and a general planning type scenario, there's a lot of facts that go into the analysis. But once again, we have to hop back to Montana. We have to hop back to that second exception. And the reason why I started, Judge Hurwitz, with the preface, I think that the preface to the Montana exceptions is often forgotten, although it is cited in Strait, it is cited in Nevada v. Hicks, and it is cited in other important cases determining tribal jurisdiction. And that is defining specifically what the court had in mind in Strait with regard to what a tribal government could do. And that is controlling internal matters, such as divorces, inheritances, membership, those things that maintain internal political sovereignty to the tribe. And the reason I ask questions about that is it just seems to me strange that if there had been a strip of land around the other side, we would be on the other side of the Montana exception. We would be saying, well, but now we're talking about internal sovereignty. But if there isn't a strip of land around the other side, then the burden shifts. And I guess that's what the Supreme Court told us. That doesn't, again, in your response to Judge Hurwitz, isn't it the case that even if there were a strip of land around it, that's just the beginning of the analysis? It doesn't change the presumption. Yeah. You've got to have a series of other things, which in the aggregate would bring catastrophic consequences, to quote the Chief Justice, to the tribe. What you had in Brendel is a situation where right in the middle of the reservation, somebody going to put in a casino, bring in the public stuff, it totally changed the character. And there was a religious component to that area. There were just all kinds of things where this would mess up perhaps millennia of tribal involvement and tribal customs. None of that's present here, is it? It is not. In fact, following along with that example, if you put the Evans property, a single family dwelling, right in the heart of the closed area, as in Brendel, there may still not be tribal jurisdiction. Well, that's what I was trying to ask about. And I didn't articulate it well, Your Honor. I apologize for that. Your Honor, I would like to set aside five minutes for rebuttal. OK. You want to just keep the remainder of your time? Thank you. That's fine. We'll hear from Mr. Echohawk. Thank you, Your Honor. May it please the Court and counsel, I'm Mark Echohawk. And I represent the Shoshone-Bionic Tribes. National farmers and Iowa Mutual are still the law of the land. The development of cases from the US Supreme Court is important. As the Court mentioned in the beginning, there are multiple Supreme Court cases that have language that are on the other side of this question, seemingly. But if you look at the legal development, National Farmers and Iowa Mutual came out in 1985 and 1987. Since then, three times, the United States Supreme Court has decided, has issued opinions that have some bearing here. Hicks, Straight, and Plains Commerce all came out subsequently. But those three cases were not exhaustion cases. In fact, just to the contrary, exhaustion happened in those cases. In Straight, they exhausted up to the Tribal Court of Appeals. In Hicks, they exhausted. And in Plains Commerce. After those cases, I mean, now that they've all been, and I take your point. It was one of the questions that troubles me in this case, which is how much of a showing do they have to get to not have to exhaust? But now that those cases have been decided, how can you argue that it isn't clear that the tribe can't exercise jurisdiction over this particular situation? In other words, we have those cases now, even though they weren't exhaustion cases. They tell us, Straight tells us, that the land use must threaten tribal self-government. How does this threaten tribal self-government? Your Honor, you can still make that argument, because in Straight, it says, in cases such as this one, and literally the second to the last sentence of that opinion, in footnote 14, it says, in cases such as this one, where you have a run-of-the-mill accident on a state right-of-way, on a state highway, exhaustion wouldn't make any sense, because the law makes it clear, almost impossible, for the tribes to have jurisdiction. Same thing with Hicks. OK, so why doesn't, and I guess my question is, no matter how those cases arrived at the Supreme Court, whether they arrived through an exhaustion posture, or whether they arrived by somebody going to district court initially, tell me how, in light of those cases, you can now argue that the, in effect, your zoning authority, or your building permit authority over the Evans House, that if they went the other way, it would threaten tribal self-government? How does their building threaten tribal self-government, or the integrity of the tribe's political situation? Your Honor, in none of those cases, Straight, Hicks, or Plains Commerce, were you dealing with non-Indian activity that was occurring on the land. In Straight and in Hicks, you have a rule that comes out that says there are some situations where it's almost impossible for a tribal court to have jurisdiction. For example, in Hicks, where you have state officers performing state official duties, tribal courts can't weigh in on that. And similarly, with a state right-of-way on a state highway, tribal courts can't really weigh in on that. The same thing with Plains Commerce. They said, we're not really dealing with activity that's occurring on the land. It can't really harm tribal governance. But you have argued for, at least, bases that are just such things that you claim are the basis of their having to go forward with an exhaustion claim in this situation, now you're not? Yes, Your Honor. So which way is it? Does it count, or doesn't it count? There are multiple grounds for tribal jurisdiction in this case, not just Montana exceptions, not just whether their activity imperils. And we'll get to the treaties and all that sort of thing. But we have the Elliott case, which you're very familiar with, that indicates when it's plain, the tribal jurisdiction is lacking, that there's no exhaustion requirement when it would serve no purpose other than delay. Do you have any case law, either from the Supreme Court or our court, that says to the contrary? Your Honor, there are multiple cases that define what plainness means. Dish network. OK, well, let's say that's true. But the reality is, plainness, based on current Supreme Court law, which is what we're dealing with, if in the judgment of the court we conclude that the facts of Glendale are wholly distinguishable, and that the facts here don't conform, there is no requirement, is there, under Elliott, that this go through an exhaustion when, at the end of the day, all it does is delay the inevitable. If that were true, yes. But here, it's not. The only rule we have from the Supreme Court is Brindale. And that's a factually intense inquiry. And it is a factual inquiry, which we have to engage in. And if you look at the facts of Brindale, if we have those kinds of facts here, then, of course, you're absolutely right. But if, in fact, we don't have such facts, we have wholly distinguishable facts, then would you not agree that there is no requirement to exhaust? Because at the end of the day, you've done nothing but delay. That would be true if we had a fully developed factual record. Here, we don't. In fact, we cannot do justice to the jurisdiction question in this case, because a full factual foundation has been frustrated by practicality and procedure. As a matter of practice, the tribe's efforts to gather information, the very information Brindale wants us to look at, have been stymied. We never got to see building plan. But you got Judge Windmill, who's an excellent judge, allowed you to bring in a whole bunch of things in your reply brief and gave the other side a chance to respond and so on. You got all kinds of things in that may not have been fully developed. But you certainly got the legal points in. You got the cases in. You have arguments about water. You've got arguments about fire. You've got arguments about all kinds of things. Is there anything that would need to go in that you believe is not in the record now? And if so, what is it? Absolutely, Your Honor. It's the full decisional matrix that a tribal court would develop. So you're saying, in order to show that they have to exhaust, we have to go through the exhaustion? Your Honor, to conduct a true merits analysis is to ignore the very purpose of exhaustion in the first place. We have, in this case, maybe 14, I don't know the exact count, affidavits that were prepared in a window of preliminary injunctive relief procedure compared to, and that's a pretty thin record, compared to depositions, discovery, witness testimony sworn on the stand in Brindale. We had that kind of factual record because they had multiple actions in federal district court to develop that factual record. Here we would have, if we went through discovery, we would have that full decisional matrix. And would that matrix counsel occur as part of the tribal court, a tribal exhaustion, or would it occur in the district court? Part of the tribal exhaustion. It would occur in the district court. I'm sorry. It would occur in the tribal court. So basically, the exhaustion question is subsumed into your contention. By definition, you say that an exhaustion must occur through the tribal court in order for you to develop the record, which basically eclipses the question to start with. Unless you have facts that bring us within Strait or Hicks or Plains Commerce, where you know the tribal court cannot have jurisdiction. But because it's a Brindale case, and because that's factually intense, we need that kind of discovery to do justice to that jurisdictional question. Put aside your treaty arguments for a second, because I'm still stuck on the Montana exception, we have here somebody who wants to build a single family residence on property that he owns. Why does the inability of the tribe to issue a building permit and licenses with respect to that property threaten its political integrity? We learned in Brindale that even decisions in discrete zoning cases have incremental shift impact on the tribe's ability to define the essence of the reservation. And even though it's a single family dwelling, especially in this particular area where you have a Superfund site, you have EDV, ethylene digromide contamination concerns. Even a single family dwelling can either have adverse impacts on the residence. But that's all speculative, is it not, counsel? I mean, like with the water, that's been there for over 20 years. That issue having nothing to do with this gentleman's site. Are you saying that speculation about what a Superfund site might do is enough to trigger the exhaustion requirement in the tribal court? I'm saying it, and so is the Eighth Circuit, and so is the Ninth Circuit. In both Rincon and in the Dish Network versus Leducer cases, they talk in terms of potential impact. Could it impact tribal interests? And until we have that information, this court can't really make that call. And eventually, this is the place the federal court will weigh in on whether the tribal court is extending boundaries of jurisdiction too far. But it can do that only fairly after it has let that factual record develop, and it has the benefit of tribal expertise in addressing these very particular questions about the tribal ordinance and the treaty itself. So in some ways, the arguments that both of you are making come down to burden of proof. Or what your opponent is saying is that we have a house in an open area next to the reservation. They've got to show that there's some extraordinary effect on tribal integrity in order to bring this within the jurisdiction. And you're saying, we sort of start off with the assumption that you're inside the reservation, that you're affecting tribal integrity, and now we'll go do discovery to see if you can disprove that. Is that a fair statement of where you two are? Almost, because National Farmers Union and Iowa Mutual start with a presumption just the other way, where they say, we presume this is going to be a tribal court jurisdiction matter unless these exemptions apply. And those are the only cases. Those are still the law of the land. Strait didn't overrule it by a footnote sub silentio. But I thought that the presumption was just the opposite, that in fact, the presumption is that fee land within the reservation, there is a presumption against tribal jurisdiction. Isn't that correct? The cases that have talked and used that language have been exhaustion cases where exhaustion has already happened and the federal court now is weighing in on the actual merits. There's no case where exhaustion hasn't happened, where the court says, we're going to start with this premise, and we don't even need you because it's a Brindale analysis. And I'm talking about this Brindale factually intent. So from your perspective, if there's any possibility of anything, however speculative, it all has to run through the exhaustion of the tribal court, that the presumption issue is by the board, Plains Commerce is by the board. You're going to get that first. And then you'll see whether the tribes who've already exercised jurisdiction have jurisdiction. Not quite, Your Honor. What I'm saying is not just is there any possible chance out there. Speculation is what I'm suggesting. It's a low standard. This is the Ninth Circuit standard in Elliott. Is it plausible or colorable? And that does not mean that we first conduct a full merits analysis, and we kind of figure out how the federal court's going to weigh in on this, and we just save everybody the time. But what we're dealing with here is it not under Elliott. We have to put flesh on this. And in that case, in Elliott, we made clear that they do not have to do that if it has no other purpose than delay. So if the law in interpreting the Supreme Court cases and so on suggests that, in fact, there is no jurisdiction, then there is no requirement of exhaustion. Is there? That would be true. But the law as it stands is Brindale on this particular question. What it says is you have to look at the facts. And we don't have those facts yet, Your Honor. In the last couple of minutes, I have. Well, wait a minute. What facts don't we have? What facts don't we have? You had the opportunity to develop the facts, right? When you file how many affidavits? Your Honor, we had about we had several weeks to develop by affidavit facts that are here. And for my question, though. So we have had some opportunity, but that is nothing compared to what Brindale actually had. We would love to bring to this Court all the facts. But Brindale is a different situation. I mean, because Brindale, you're dealing with two separate, I don't want to call them parcels. I can say parcel, not in a technical sense for the real estate lawyers, but two parcels of land, right? I mean, Wilkinson and Brindale is how I think of them. But Wilkinson was very much like this land. Yes, Your Honor. But in Brindale, they had two separate district court, federal district court actions to develop those facts and bring them to the court to make that decision. So what is it that you want us to do? Do you want us to send you back to the district court so you can fully develop the records so the district court can decide this issue? I thought you wanted to go to, you wanted to force them to exhaust. That's correct. I want this Court to follow what Judge Windmill decided was the right thing. And he was saying, we don't have enough facts. Besides, to gather those facts and decide now would intrude upon the very purpose of the exhaustion doctrine, which is still the law of the landless. Go to tribal court, develop that record, and then bring it back here. The Evans have a remedy in federal court after the fact, but only after all the facts that we need are actually brought to the table. Your Honors, in the last few seconds that I have, I want to point out that it is plausible under the law, either under the treaty or congressional delegation, or under a Brindale analysis, Montana Second Ception analysis, the law permits the possibility. And it's a low standard to show that plausible or colorable nature of the case. And the facts show it. Of the multiple affidavits, the tribes, even in a few weeks, were able to show that there are multiple straight-based concerns here. The Shoshone-Bannock tribes have significant ties to this land. This is their permanent homeland, promised by treaty, which is the supreme law of the land. They have the right, under National Farmers and Iowa Mutual, to develop a record and present that to the federal courts at some point to review. I think we have your argument, and thank you very much for that, counsel. You have a little rebuttal time, counsel. Your Honor, one of the questions, Justice Hurwitz, that you asked of Mr. EchoHawk was with regard to jurisprudence. And the fact that we have, since the exceptions or the exhaustion rule has been denominated, don't we have something now to rely on to determine what is plain and what is not plain? The Ninth Circuit defines plain as plausible or colorable. No question. That's where the Ninth Circuit comes down on that. But we do have a number of cases that have come down that have defined. And that's the reason why I place so much emphasis, Your Honor, on the Brindell and specifically the Wilkinson property. This is Wilkinson Light. Single-family dwelling versus 20 single-family dwellings with septics and wells. Now, Justice Smith, you brought up the other way. I should remind you there's no justice in the Ninth Circuit. We're all judges. Judge Smith, I apologize. You can take that however you want. I apologize. You asked a very good question with regard to burdens, and you're right on it. The burden here is on the tribe to show that there is tribal jurisdiction. What did they do in the factual determination that was placed before Judge Windmill? They submitted many affidavits that they were attempting to fit within a set of facts that would create plausible and colorable arguments of jurisdiction. They argued groundwater contamination. And as Judge Smith correctly indicated, it had been the EDB concerns had been in effect since 1993. They argued illegal dumping, but there was no nexus made to the Evans property. Only somebody on the reservation dumped construction waste elsewhere. And then the third thing that they brought up was, well, we've got a concern about fires. And what they were trying to do, Your Honors, is they were trying to bring that into the Rincon Mushroom analysis. Big difference between this case and Rincon Mushroom. In that case, which is an unpublished decision, by the way, factually, the fire actually happened in that case, and it was right across the street from the casino, which was the primary source of income for the tribe. Also, in that case, there was an allegation of groundwater contamination, but it was the only source of groundwater for that particular tribe. Wholly distinguishable from this case. Wholly distinguishable. In this case, correct me if I'm wrong. I thought I saw in the record a kind of a photograph of this area. I didn't see any trees anywhere close to this place. Is that fair? Your Honor, if you've ever been to southeast Idaho, trees are sparse. I actually have. Yes, this is not a foresty area. This is kind of like a little rolling plain kind of area, right? Correct. Very full of sage, intermountain desert, airport directly to the west, agricultural land to the northwest. And the Evans property sits within a bunch of other single-family dwellings, which are non-Indian fee land. As I understand it, one of the neighbors, and I've forgotten the name, was required by the county to go through a zoning process at an earlier period of time, and that the tribe did try to intervene in that case and was not successful. Is that correct? Your Honor, I believe you're referring to the Sorter opinion, which was a Power County case that prosecuted Mr. Sorter for not obtaining a county building permit. And the 6th District and the county and the state court upheld and required Mr. Sorter to obtain and actually charged him criminally, found him criminally liable for not obtaining a building permit. And did the tribe or one of the tribes intervene or try to intervene in that case? Your Honor, the only thing that I can say is that Mr. Echo Hawk represented Mr. Sorter in that. But as far as an intervention is concerned, I don't want to misstate a fact. I'm not sure. I understand. I'm not sure. So tell me what, do you agree that plausibility is the standard? I do. What would the tribe have to show to establish plausibility in your view? Your Honor, in the affidavits to fulfill their burden, they need to show something. They need to show something that creates a nexus between, in this particular case, what the Evans are doing in building a single family dwelling and the potential to imperil the subsistence of the tribe's sovereignty and its ability to internally regulate. Something. And, Your Honor, when you look at- Can this be an aggregate analysis or must it be an individual analysis? It can be an aggregate analysis. It hasn't been done here. The affidavits, which the burden remains on the tribe to assert that they have jurisdiction because it's presumptively invalid in this case, they have to come forward and they can, in an aggregate situation, on a fact-by-fact, case-by-case analysis, can assert those jurisdictional plausibility elements. It was not done here. As I understand your argument, you're saying, yeah, that plausibility is the only reason that those terms have been provided by Plains Commerce, which indicates how extremely narrow the Montana II exception is, and that we then get to the second part of Elliott, which talks about if requiring exhaustion, the only requirement or the only purpose would be to delay that exception, and that's what you're saying, is that the fact-by-fact analysis informed by Plains Commerce provides the meaning, if you will, of plausibility or colorability in this case. Absolutely. We can't look at what plain and colorable and plausibility, we can't look at it in a vacuum. We have to look at it based upon the jurisprudence that's already been provided. That's the whole point of precedence. Okay. Either of my colleagues have other questions? Yes, I do. Thank you. Thank you both for your fine arguments. We appreciate the hard work that you have done. This is a very difficult and interesting case. We appreciate its importance, and we thank you for your help. The Court will now stand in recess for the day.
judges: Mahan, Smith, Hurwitz